This case involves two young women, Morgan Pearson and Kirsten Kirkpatrick. They attended Logan University starting in 2015. Both women had for years prior dreamed of becoming chiropractors. In fact, in the case of Ms. Pearson, since she was a little child she had dreamed of being a chiropractor. She and her grandparents drove by Logan University and she told them, this is where I want to go to school. They were both straight A students and they both did what they had to do to get enrolled into Logan University. And they began to realize their dreams of attending Logan. This case arises because those dreams became nightmares. Both students upon starting at Logan University learned a disturbing secret about Logan University and that was that in so many ways Logan had a tremendous systemic problem with protecting or not protecting their young female students against predatory males and sexual discrimination. This was a problem that existed before parents arrived at Logan and this was unfortunately a problem that persisted throughout their tenure there. Because of Logan's failure to protect the parents, both of them ultimately withdrew from Logan. They lost out on the educational opportunity to attend the chiropractic college of their dreams due to Logan's failure to protect them. To make a long detailed story short, one which I will revisit as I can, both Ms. Pearson and Ms. Kirkpatrick were sexually harassed by a predator, an overbearing male student that simply would not leave female students alone. And in the case of Ms. Pearson, stalked her unceasingly for months, her entire tenure there. Also did the same, also harassed Ms. Kirkpatrick. Both students turned to Logan for protection and both students were denied protection. Would you describe what, how the circumstance was brought to the attention of the university and what the university did in initially responding to the first notice they received of this? And would you put the time frame in context? When school started, when the incidents began, when there's a report or the school could be reasonably charged with notice? Yes, school began in September of 2015, thereabouts. Ms. Pearson was harassed for at least two months. And then she first, she first didn't report what had happened to her because she actually didn't know that she could. And then secondly, she was not aware of what to do in the case of a Tile 9 complaint. And secondly, there's plenty of evidence of the fact that she was told by her fellow students that complaining would make no difference, that the school wouldn't protect her. But ultimately the behavior of the harasser got so bad that on December 8th, she went, Ms. Pearson went and told a faculty member what had happened. And that under law, What was that date? December 8th, 2015. So toward the end of the first semester. Yes, Your Honor. Yes. And so what then began, and Ms. Kirkpatrick reported what happened to her later on. But what then began is the basis of at least the Tile 9 claim. The underlying, the overall circumstances support the negligence claims and premises liability claims. But for a Tile 9 claim, the United States Supreme Court has made clear that a Tile 9 claim can be made when deliberate indifference is shown. And deliberate indifference exists where the defendant's response to harassment or lack thereof is clearly unreasonable in light of the known circumstances. Now, didn't, didn't she initially want to remain anonymous and then change her mind later on in the process? Yes, she did. And I mean, is there, what is it that's clearly unreasonable about an institution doing what they can to respect anonymity, doing what they can on the investigation while the complainant wants to remain anonymous. And then when she changes her mind later on, opening up a fuller investigation, my recollection is that's what Logan did here. And that just on its face doesn't immediately strike me as clearly unreasonable. Well, sure, Your Honor. That, that's, that's on its face doesn't strike you as clearly unreasonable. And that's actually what this case is about. That on its face, from a 30,000-foot view, it looks as though Logan responded appropriately. But to, to talk directly about the anonymity, the anonymity was later just used as an excuse. It was not an explanation for not starting, initiating an investigation. Ms. Pearson actually met with... But there would be limitations on what you could do when you talk to people... Yes, Your Honor. Yes, sir. ...about someone who they can't, who you can't tell. There, there would be limitations. There would be limitations, and those limitations were actually explained to Ms. Pearson. The Title IX coordinator said, well, I can't investigate this. I can talk to students, and I can talk to students and say, there's, is there a classmate that you guys have noticed is receiving, being harassed? And Ms. Pearson gave a list of multiple, almost a dozen students that she wanted to be approached in that manner. It wasn't until January 19th, which was at least six months or six weeks after she had first asked that the investigation be initiated, that she found out that the investigation hadn't been undertaken at all. The only thing Title, the only thing the Title IX coordinator had done within that six-week period was talk to the suspect, and actually clue in the suspect that Ms. Pearson was the one making claims against them. And that, that aspect right there is enough for a jury to find deliberate indifference. The fact that she was exposed due to the way that this was investigated. So that... Is there, is there a case that holds that? Um, yes, Your Honor. There is, um, there's a lot of, a lot of different ones, and we've cited a couple of them. That specifically, that aspect, that is talked about in a lot of the deliberate indifference cases, where, where the cases say, if an investigation is undertaken in and of itself, that's, that's not sufficient to say that as a matter of law, the school wasn't deliberately indifferent. What you can do is you can look at the details of how this investigation was handled. So, the anonymity is just the first part of the investigation. And that, that was given as an excuse to not initiate this investigation for a full six weeks. But then, what we presented to the district court is literally a laundry list of factors that established that the school was deliberately indifferent, as a matter of law. And the district court... What were those? I'm sorry, okay, so... What were those? Well, to give you, to give you one of the most glaring examples, and this is a glaring example because the district court didn't even mention it, and that was the problem with the district court's opinion, was the district court just overlooked facts in plaintiff's favor. But one glaring factor was the fact that the student honor council that was to hear Miss Pearson's claim, the leader of that honor council testified under oath that he did not know what the legal standard was. He specifically said, we didn't have any preponderance of the evidence standard or anything like that. We just all kind of decided. And that... But didn't they find that there was no evidence of harassment here? I mean, they didn't apply a legal standard, but the finding was there's just no evidence here, as I recall, of the honor council. Right. I believe that is what the student honor council found. If they did find that way, and that was, that was the result of another very deeply flawed aspect of the investigation, and that was that the Title IX coordinator, when presenting the case to the student honor council, wrote a report that contained facts. The facts, the quote facts, that we learned after deposing her only included the facts that the suspect agreed to. So a certain fact that Miss Pearson let the suspect know 12 to 18 times, told him to stay away from her. That was just completely excluded from the facts. And that's, again, that's just one of a laundry list of factors that show deliberate indifference. That fact was coupled with the fact that the Title IX coordinator, who did the investigation, who also testified that her job is just to gather facts and then present them, she sat in with the student honor council while they made the decision. What we really think happened here was just a school in general trying to kind of push under the rug an incident so it didn't look bad for them overall. And you saw that in so many ways as this thing unfolded. And those are all outlined in our briefings. One thing I did want to touch on quickly, and I'll issue, I'll submit a Rule 28J letter on this, is in March, about mid-March, the Tenth Circuit decided a case, Farmer v. Kansas State University. And that case is important because what that case said is that you can have deliberate indifference when a funding recipient, well, what it said was, when a funding recipient's deliberate indifference must cause students to undergo harassment or make them liable or vulnerable to it. That was quoting the United States Supreme Court. And what the Tenth Circuit then said in that case, that that phrase, make them liable or vulnerable to it, applies and is satisfied when students have to withdraw from a university because they're not protected. And that's exactly what happened in the case of Ms. Pearson and in the case of Ms. Kirkpatrick. They both ultimately withdrew. They knew they wouldn't be protected. Ms. Pearson had already endured months of stalking and harassment. She did everything she could, and she was given this process that, on its face, did appear reasonable, but then looking at the details was just drastically flawed, drastically infected. So I can go through the list. I mean, you know, the fact that Logan initiated the investigation on December 8th, that was just a nominal, quote, unquote, initiate the investigation. They actually did nothing, as I told you guys, until January 19th. And even after January 19th, they still did nothing. Ms. Pearson had approached them, all the while being stalked and harassed. It actually got worse. The behavior of this male suspect got worse. And she went to and really the Title IX coordinator did not... Were there any criminal reports made to campus police or law enforcement? So that's another issue, and that goes into the negligence and premises liability claims. And the issue with that is that the campus security was drastically insufficient. This was a large college campus, and there was one security guard working at all times, one. And he testified that it would have taken him at least 10 minutes to cover campus in case of any sort of emergency or in the case of a student need. But she could have reported it to law enforcement. Well, it was. It was reported. Yes, it was. Campus security knew about it. But campus security was just limited in what they could do because it was totally insufficient. I mean, she couldn't even ask for, like... When was the campus security report made, and what was the follow-up? He testified that the campus security officer we talked to testified that he was reported at the same time that she made the claim, or at least shortly thereafter. In December? Is that the time you're talking about, in December? Yes. He couldn't remember when we deposed him exactly when he had been informed, but he assumed that it was early on. And he wasn't given instructions to protect her. He was just given instructions that this is going on, and he was made aware. But as he testified, there was basically not much he could do. I mean, he was one person working by himself. It'd take 10 minutes to get from one area of the campus to another. One thing I'd like to talk about, and I'm not eating into my rebuttal time, am I? You are. Okay, I am. So unless you guys have any other questions, I'm going to save it. All right. Thank you, Mr. Harbaugh. Thank you. Mr. Blackwell? Good morning, Your Honors. May it please the Court. Based on the record before it, the District Court found that Logan University was not deliberately indifferent to Ms. Pearson's complaint of student-on-student harassment. Under Title IX, there is no specific protocol an educational institution must follow when responding to a complaint of student-on-student harassment. Rather, Title IX provides an educational institution flexibility to determine an appropriate response to a reported complaint. But you're supposed to do something. Absolutely, Your Honor. And in this case... So describe for us what was done in response to the Title IX claim or the report. Maybe not... A student may not have even known to call it a Title IX claim, but simply reporting that there was harassing conduct taking place, what was the school's response? And I can walk you through the timeline, Your Honor. On December 8th, when Ms. Pearson went to the Associate Dean of Students, she made a complaint of harassment by another student. The Associate Dean of Students asked her to document her complaint in written form. The very next day, the Title IX Coordinator met with her and interviewed her as to what her allegations were that she was making against the other student. Were the allegations ever reduced to writing? They were, Your Honor. Initially, the Title IX Coordinator reminded Ms. Pearson that the Associate Dean of Students had asked for a written report, and the Title IX Coordinator expected to receive that report just a few days later. However, a few days later, Ms. Pearson wrote an email to the Title IX Coordinator asking her for more time to write that report. Eventually, when Ms. Pearson wrote that report on December 21st, the school had already gone on winter break. It was just a couple days before Christmas, and the students weren't on campus anymore. And the Title IX Coordinator advised Ms. Pearson that the delay in getting her that alleged harasser until he returned to campus. The day classes resumed on January 5th, on 2016, the Title IX Coordinator contacted the alleged harasser and met with him. She then met with him again a subsequent time. It was after that second interview with the alleged harasser, she then spoke to Ms. Pearson again and said, your request to remain anonymous prohibits me from both respecting your request and investigating this further. How about the suggestion that she could have spoken to students generally about, have you noticed any harassment? Your co-counsel suggested those interviews could have been conducted without revealing the identity of the student. I think that it's certainly possible that there could have been, I guess, vague questions as to to focus in on the alleged harasser or to identify Ms. Pearson would have been to disclose and break her request for anonymity. When she lifted her request on February 3rd, 2016, that very day, the Title IX Coordinator sent out emails to prospective witnesses. And over the course of the next four weeks, the Title IX Coordinator interviewed 15 other and specifically asked him whether or not he had done any of the things that she complained of. Within that four-week period, the Title IX Coordinator also assembled the Student Honor Council. Ms. Pearson was permitted every opportunity to respond to the report. Did any of the 15 witnesses corroborate the allegations of harassing conduct? Not specific to Ms. Pearson, your honor. None of them saw any direct harassing conduct or stalking. Part of the allegation was that she received threatening text messages, but Ms. Pearson herself could not produce those at any point during the investigation. So if you look at the timeline and what you asked, your honor, what did the university respond? At first, they respected her request for anonymity. And as soon as that was lifted, they conducted a thorough investigation. And that, in Title IX, doesn't require any specific protocol, as I was mentioning at the beginning of this argument. But what it says is that it only imposes liability on an educational institution where its response to a complaint of student-on-student harassment is clearly unreasonable. A complainant's dissatisfaction with the outcome of an educational institution's decision is not grounds for Title IX liability. Now, there are three reasons we would ask that this court affirm the district court's order and judgment in favor of Logan University. The first is that there was no evidence demonstrating Logan University was deliberately indifferent to known acts of harassment. Second, the district court properly relied on the undisputed material facts of record. And third, the appellants failed to establish that Logan University had a duty arising under special circumstances to ensure appellants' safety. Now, at some point, I think Logan instructed the Alessia student-alleged harasser not to have contact. They did, Your Honor. When did that occur? After, on February 3rd, after Ms. Pearson asked for her, allowed Logan University to reveal her name as part of the complaint. At that point, the Title IX coordinator met again with the alleged harasser. The Title IX coordinator first barred him from access to the library where Ms. Pearson had occurred. He was to have no contact with Ms. Pearson, and he was to avoid all undergraduate classrooms unless he was attending that class during dependency of the investigation. And that was only lifted until the Student Honor Council met and decided on March 11th that the alleged harasser was not responsible. After that February direction, were there additional allegations made? No, there were not, Your Honor. During the time that they instructed the alleged harasser to have no contact with Ms. Pearson, there was no other reports of any problems by her. And after it rendered its decision on March 11th, despite finding the alleged harasser not responsible, he was still instructed to have no contact with Ms. Pearson going forward. And again, that brings me back to my first point, which is to avoid deliberate indifference liability. A higher institution must merely respond to a known peer harassment in a manner that is not clearly unreasonable. This standard, Your Honor, is intended to afford flexibility to school administrators. And clearly unreasonable is not a mere reasonableness standard. Rather, it is a high bar that seeks to eliminate the risk that an educational institution would be found liable in damages for another individual's actions as opposed to its own official decision. Now, Logan University's response to Ms. Pearson's complaint stands in stark contrast to the facts in this court's decision in Ostrander v. Dugan. While the university in Ostrander passed the responsibility to conduct an investigation and render a decision unto a national fraternity organization, here Logan University's Title IX coordinator took substantial steps in response to Ms. Pearson's complaint. The undisputed material facts in this case show that Ms. Pearson was immediately referred to the Title IX coordinator and they met on the very next day. The Title IX coordinator thoroughly investigated Ms. Pearson's complaint, interviewed numerous witnesses, and authored a comprehensive report as to what steps she took in response to that complaint. After that, the Title IX coordinator also met with Ms. Pearson several times to update her on the progress of that investigation. Now, in Ostrander, despite failing to conduct an investigation, this court affirmed summary judgment in favor of that university because its conduct in referring the investigation to a national fraternity was not clearly unreasonable. Here, Logan University's response to Ms. Pearson went above and beyond that of the university in Ostrander. Thus, the district court's order in judgment in favor of Logan University was consistent with Ostrander and this court's precedent. Second, the district court properly relied on the material facts of records before it. After more than a year of discovery, which included extensive document discovery, interrogatories, requests for admission, and 19 depositions, the plaintiff filed affidavits in summary judgment, which contained a combined 446 paragraphs of purported facts, over 41 pages, in an attempt to muddy the record. However, none of the purported facts contained in those later filed affidavits contradicted or even denied the material facts of this case in the timeline we've discussed, Your Honor. Counsel, would you describe the Honor Council, the school's Honor Council? Yes. Would you describe its makeup and how it's established and what's it, how is it instructed to proceed on matters? Yes, there is a pool of faculty members, administrators, and employees that receive Title IX training and that are qualified by the university in their opinion to hear Title IX complaints. Of the pool of candidates, when Ms. Pearson made a complaint and after the Title IX coordinator in this case had written her report, she sent an email out to that pool of candidates asking if five of them were available to sit on the Honor Council. So Honor Council members are faculty and staff? They are. They're not fellow students. I know the name, Student Honor Council, can be confusing, but they are, they are employees of the university, whether they're faculty members who teach, whether they are staff members in administrative positions, or other administrators at the university that have received Title IX training and are qualified to hear a complaint. Who provided the Title IX training? Where did that come from? Some of them, I think, were external. Some of them were internal CLEs where attorneys would actually come to Logan University and give presentations on what the law required and how universities were to respond in specific instances of receiving a Title IX complaint. It wasn't always uniform. There was a number of different programs and every year there was an annual kind of reminder just as we have to do CLEs. There was a reminder that the university does every year, a program where everyone gets renewed Title IX instruction and instruction on if there's been any changes in the law that they should be aware about. Is there some rule book or procedural manual that describes how process is to proceed in front of the Honor Council? There is a, the student handbook, Your Honor, outlines the entire process. There isn't, I can't recall standing here today whether or not that protocol says that as a Honor Council member you must do A, B, and C, but as part of the training that they receive it is on how to hear and decide Title IX complaints. So describe the process of the hearing of this case before the Honor Council. Is that in the record? It is, Your Honor. On December 8th, Ms. Pearson, so to take a step back, the Title IX coordinator authored a report of her investigation and interviews. She provided that report to Ms. Pearson who was given an opportunity to have a written response. She also provided that report to the alleged harasser who also had an opportunity to provide a written response to that report. All of those documents were provided to the Honor Council. First, the Honor Council on March 8th, 2016 met with Ms. Pearson and her mother who accompanied her to the hearing and gave her, basically said, our time, whatever time you need to walk us through what happened, we are here to listen, tell us what happened, we'll give you every opportunity to raise any points you want. Two days later on March 10th, they did the same thing with the alleged harasser. We, we, these were the allegations made against you, how do you they convened after they had an opportunity to meet and speak with and discuss the allegations that were made and made a unanimous decision that the alleged harasser was not responsible and that was the process they followed. That decision was then communicated by the Title IX coordinator to Ms. Pearson and the alleged harasser. Did they listen to witnesses other than the two? The only, they considered that there was summaries that were part of the title, they did not have any live witnesses to answer your question, Your Honor, but there were summaries of the witness interviews that were conducted by the Title IX coordinator that were part of her report. So they had a summary of all of the witnesses and what was disclosed to the Title IX coordinator as part of her investigation. So the two principals got to review what all was submitted to the argument? They did, Your Honor, and I apologize if I wasn't clear about that. Were they afforded an opportunity to suggest amendments or objections to any of those? Well, yes, as part of Ms. Pearson's written response, she did respond to the statements that were made by the witnesses that were interviewed of the Title IX coordinator, but directly was there any type of cross-examination as part of the hearing? No. No, I didn't anticipate that, but at least just an opportunity in paper. Yes, yes, she did respond to all of the, the way the report was written is it had, you know, this is the process I followed. Here are my witness summaries. It's everything that I would learn through the investigation that was provided to Ms. Pearson and the alleged harasser, and they both provided written responses to that report. I see I'm running out of time. If you have no other questions, Your Honors, I'll conclude. For the foregoing reasons, I respectfully request that the court find in favor of the Applee-Logan University and affirm, excuse me, the District Court's judgment in its favor. Thank you. Thank you, Mr. Blackwell. Mr. Harvath, your rebuttal? So in listening to Co-Counsel in preparing rebuttal, just about every single fact that he presented to you, I have a rebutting fact, and that's the problem with, with this case and how it was decided on summary judgment is that these are all factual matters. For instance, you can talk about the Student Honor Council, and my Co-Counsel can say that there was a process, and there was a procedure, and there was training, but when we deposed the leader of the Student Honor Council, who was actually just an administrator at the school, he said that he hadn't received any special training, and he testified that they never applied a standard. They didn't even know if there was a standard, and Co-Counsel said that Ms. Pearson was given an opportunity to reply and rebut the facts in the report. She was, but then she got into the Student Honor Council meeting, and she learned that they had apparently not even seen it, and then we talk about a report that was put together, and live witnesses didn't come in. They were allowed, they were only shown a report that the investigator put together. We've already talked about the report. The District Court basically ignored the fact that that report was so biased and so one-sided that it was almost worthless, and the woman that put it together even testified that a fact was only submitted to the Student Honor Council as a fact if the suspect also agreed with it. So what this comes down to is a tremendous amount of disputed facts, any one of which, there's probably 10 different factors, any one of which could establish deliberate indifference, and any one of which could also establish a duty and then a breach of a duty. So we have large sets of facts that really just prohibit this case being decided on summary judgment, and that's the ultimate question here. Was Mr. Blackwell accurate in his representation that after the start of the second semester, I guess by February, there were no more additional... No, no, Your Honor. No, that's not accurate, and our briefing spelled that out, that Ms. Pearson was harassed, and it actually increased. Through February, it got worse. There was an incident, we mentioned it specifically, where the suspect at this time knew that it was her complaining, held a door shut while she was trying to go into a classroom. And this was after the no contact direction? Yes. Oh, yes. Yes. It continued all the way throughout. She ultimately withdrew just because she was so scared even being on campus. It did not remit at all. I see that I'm out of time. I guess just the last thing I'll say is, ultimately, as I've been repeating, this is not a summary judgment case. There are just way too many disputed issues of fact, and we certainly have provided the evidence. There's been a lot of it, and this is a case that should be reversed. It should be sent back to the trial court for a jury to make determinations that we've been arguing about here. Thank you. Thank you, Mr. Harvath. Thank you also, Mr. Blackwell. We appreciate the presence of both counsel and the argument that you provided to us. We will take your case for an advisement.